(No. 19442.—▮▮▮▮▮▮▮)

GEORGE E. CORCORAN *et al.* Appellees, *vs.* THE MUD CREEK DRAINAGE DISTRICT *et al.* Appellants.

*Opinion filed October 19, 1929.*

DONALD B. CRAIG, JAMES W. CRAIG, JR., FRED H. KELLY, and JAMES CRAIG VANMETER, for appellants.

T. E. BOTTENBERG, and O. B. DOBBINS, for appellees.

Mr. JUSTICE DUNN delivered the opinion of the court:

The commissioners of Lower Indian Creek Drainage and Levee District filed a petition in the county court of Cass county on August 23, 1928, for an order directing the execution of certain proposed additional work by the district according to plans submitted with the petition. Objections were filed, which were all overruled, and an order was entered directing the construction of the works proposed according to the plans, profiles, plats and specifications therefor accompanying the petition, and ordering the levy and collection of $71,167 to pay for the work and damages, with the necessary expenses and costs. Mud Creek Drainage District of the counties of Cass and Morgan and several owners of land in that district and in Indian Creek Drainage and Levee District No. 2 have appealed from this order.

Indian creek is a sluggish, winding stream which flows through the south part of Cass county from east to west and after entering Morgan county finds an outlet into the Illinois river. In the upper part of the creek, Clear creek entered it from the north from section 21, town 17 north, range 12 west of the third principal meridian, at or near the boundary line between sections 21 and 28. About a mile lower down Mud creek entered Indian creek from the south near the center of the east half of the northwest quarter of the southwest quarter of section 28. The

Mud Creek Drainage District was organized out of the lands lying along this stream, the main ditch having its outlet into Indian creek. Another district was organized of the lands draining into Clear creek, called Clear Creek Special Drainage District, having its outlet also into Indian creek further up the stream than the Mud Creek District's outlet. The petitioner, the Lower Indian Creek District, containing about eleven hundred acres of land, was organized under the Levee act on May 18, 1917, and an assessment was levied for the construction of the work of the district, consisting of a main open ditch and the straightening of the channel of Indian creek, and all of the money arising from that levy was expended in such construction. The organization of Indian Creek Drainage and Levee District No. 2 on August 31, 1917, was followed by an appeal to this court, which resulted at the June term, 1918, in the affirmance of the order declaring the district organized. Lower Indian Creek Drainage and Levee District being lower on the stream than the other three districts which have been mentioned is servient to them, Indian creek being the only outlet for the drainage of all the districts. After the organization of Indian Creek District No. 2 it constructed its main ditch within the district close to the channel of Indian creek, intersecting it in many places, and constructed levees along the ditch. Its outlet was at the west boundary of the district, which is the east boundary of Lower Indian Creek District, into the lower part of Indian creek, which here becomes the main channel of Lower Indian Creek District. The lower part of Clear creek flowed through Indian Creek District No. 2, it was the outlet of Clear Creek District into Indian creek, and it joined Indian creek near the point where the latter stream crossed the boundary between Lower Indian Creek District and Indian Creek District No. 2. Indian Creek District No. 2 was east of Lower Indian Creek District, Clear Creek District was north and Mud Creek District south of Indian

Creek District No. 2, and Mud Creek District was east of Lower Indian Creek District. While the main ditch of Mud Creek District originally followed the channel of Mud creek to its confluence with Indian creek, after Indian Creek District No. 2 was organized Mud Creek District was authorized by a contract which it made with Indian Creek District No. 2 to construct, and did construct, an open ditch known as the Zahn channel, which began at the upper end of the Mud creek main open ditch and entered Indian creek about four miles above the place where the Mud Creek District main ditch entered Indian creek. Mud Creek District was to pay $7000 for this privilege, and thus the channel of Indian creek through Indian Creek District No. 2 became the outlet of the Zahn channel of Mud Creek District, through which most of the water from the Mud Creek District comes into Indian creek.

The course of Indian creek from the junction of Clear creek near the lower boundary of Indian Creek District No. 2 was by a sharp bend to the southwest through the northwest quarter of the northeast quarter, the northeast quarter of the northwest quarter and the southeast quarter of the northwest quarter of section 28 to the center of the west half of the section, thence south through the east half of the northeast quarter of the southwest quarter of the section, with a wide bend to the west and northwest through the north half of the southwest quarter of section 28, the east half and the northeast quarter of the northwest quarter of section 29, continuing northeast through section 20 and then northwest to the north half of section 18. Indian Creek District No. 2 completed its work in 1922 by constructing an outlet for its main ditch through the territory of Lower Indian Creek District from the junction of Clear creek with Indian creek, at the lower end of Indian Creek District No. 2. From that point a channel was constructed with a comparatively slight curve, running first southwest and then northwest through sections 28 and 29 to a point

near the northwest corner of the northeast quarter of the northwest quarter of section 29, where it again joined Indian creek, thus cutting out the big bend of the creek from the north line of the northwest quarter of section 28 to the north line of the northwest quarter of section 29. The land through which this new ditch was constructed is sandy and parts of it are referred to in the testimony as sand hills. In the years following the construction of the channel unusual floods occurred and the work suffered great injury. The banks and levees were washed away. The sand was carried down the stream and settled in the channel, obstructing not only the Indian Creek District No. 2 outlet, but, as is claimed by the appellees, ruining the outlets of all the other drainage districts opening into Indian creek and causing the lands within such districts to be overflowed. Suits to recover damages alleged to have been caused by these means, aggregating $200,000, were brought against Indian Creek District No. 2 by Lower Indian Creek District and New Pankey's Pond Drainage District, whose outlet is into Indian creek below Lower Indian Creek District, and by owners of lands in those districts.

The plan of the petitioner is to destroy the outlet constructed by Indian Creek District No. 2 by building a dam across it at its entrance into Lower Indian Creek District at the east line of the northeast quarter of the northwest quarter of section 28, so as to force the waters which now come down from Clear creek and the Zahn channel of Mud creek through Indian creek into a new channel which it is proposed to construct through the northwest quarter of the northeast quarter and the southeast quarter of the northwest quarter of section 28, within the boundaries of Indian Creek District No. 2, to the center of the west half of section 28, thence west through the west half of section 28 to the west line of the section, thence northwest through the east half of section 29, the west half of section 20, and further on down Indian creek. This route through sec-

216

tions 28 and 29 lies between the original channel of Indian creek and the outlet ditch of Indian Creek District No. 2.

The following sketch will help to an understanding of the location of the districts, the course of the creek, the situation of the outlet of District No. 2 and the plan of the work of the petitioner. It includes the north half and the north half of the south half of sections 28 and 29, except the east half of the east half of section 28 and the west half of the west half of section 29. The heavy continuous lines show the boundaries of the various districts.

It is claimed by the petitioner that the plan of the Indian Creek District No. 2 under which its outlet ditch was constructed has been proved not to be feasible, that the ditch has been a damage to the lands and the drainage district through which it runs and below it, and that such damages cannot be prevented at any reasonable cost. On the other hand, it is claimed by the appellants that the Indian Creek District No. 2 ditch can be cleaned out, that its banks will then stand, and it can be maintained at less expense than the improvement proposed by the appellees will cost and will be equally effective at lower cost. These are questions of fact upon which a great deal of inharmonious testimony was introduced, both of engineers and of land owners. The judge who tried the case went over the ground and examined the land and the ditches under a stipulation that he should consider his view as evidence in the case.

The proposed work of the petitioner set forth in the plans, profiles and specifications presented with the petition and the engineer's report contemplates and requires the destruction of a part of the works of the Indian Creek Drainage District No. 2, the changing of the course of its main ditch within its own territory and the taking and condemnation of land within the district for the right of way of the changed ditch, and contemplates also the construction of a new ditch in the lower part of Mud Creek Drainage District and the taking and condemnation of land in that district for the right of way of such new ditch.

By the acquisition of the right of way for the outlet of its main ditch, Indian Creek District No. 2 became entitled to complete control of the channel for the purposes of an outlet for all the district drains, with the right to dominion over it and to maintain it for all time as such outlet. The channel for the purposes of enlarging, removing obstructions, and maintenance, though outside the district, was as much subject to the control of the district as any ditch

within the district, and its jurisdiction for these purposes is exclusive. (*Union Drainage District* v. *O'Reilly,* 132 Ill. 631; *Bishop* v. *People,* 200 id. 33; *Soldier Creek Drainage District* v. *Illinois Central Railroad Co.* 331 id. 249.) The work of the appellees not only contemplates the destruction of this outlet but the invasion of the territory of Indian Creek District No. 2, the assumption of control of its main ditch, changing its route, constructing another channel and condemning the lands of property owners within the district for the purposes of an easement for this work. In Mud Creek Drainage District it is not proposed to destroy any part of the works of the district, but it is proposed to change the outlet and the channel of the main ditch through the territory of the district and to condemn lands for a right of way for this purpose. Indian Creek District No. 2 filed no objections and did not appeal. The district made no appearance in the county court and has made no appearance here. The record shows that Meredosia Lake Drainage and Levee District, New Pankey's Pond Drainage District, Valley Drainage District and the South Beardstown Drainage and Levee District, through their commissioners, by their respective written instruments signed by the commissioners, consented to the construction of the proposed work by the Lower Indian Creek Drainage and Levee District according to the plans and specifications filed by the latter district. These districts are all districts whose outlets are into Indian creek below the Lower Indian Creek District. When these agreements were offered in evidence they were objected to because such consent by a drainage district could be given only by petition filed in court and the approval of the court after a hearing under section 37 of the Drainage act, in which the land owners of the district could be given an opportunity to appear and be heard, but the objection was overruled. The powers which drainage districts may exercise are only such as are expressly conferred on them by statute or are necessarily implied. (*Sani-*

*tary District* v. *Chicago and Alton Railroad Co.* 267 Ill.
252.) A drainage district is organized only for a special
and limited purpose and its powers are limited to those
which are essential to the accomplishment of that purpose.
It can raise money only for the specific object for which
it is formed and in no other manner than by special assess-
ment upon the property benefited. (*Union Drainage Dis-
trict* v. *O'Reilly, supra.*) Drainage districts are created
by virtue of legislative authority with such powers as the
legislature grants and must exercise their powers subject
to the terms of the law of their creation. (*People* v.
*Garner,* 275 Ill. 228.) The jurisdiction of each district
is limited to the territory within the district and is exclu-
sive in that territory, except as may be otherwise expressly
provided by statute or necessarily implied. Two such bod-
ies cannot exercise jurisdiction over the same territory for
the same purpose at the same time. (*People* v. *Crews,*
245 Ill. 318; *People* v. *Lease,* 248 id. 187; *West Chicago
Park Comrs.* v. *City of Chicago,* 152 id. 392; *Bishop* v.
*People, supra.*) It is necessary that the jurisdiction of the
commissioners of the district over its territory should be
exclusive. Their power is derived from the statute and
not from the judgment of the court. (*Blake* v. *People,*
109 Ill. 504; *Huston* v. *Clark,* 112 id. 344; *People* v.
*Lease, supra.*) The purposes for which every drainage
district is organized are to drain the lands of the particular
district, to protect them from overflow by the construction
of drains, ditches, levees, pumping stations, and by what-
ever means the situation and circumstances of the district
make necessary and desirable for this purpose. If the com-
missioners of another district or of other districts could
enter the territory of any district, destroy the works which
had been constructed by the commissioners of that district
and substitute others, the whole value of the law for the
establishment of drainage districts would be destroyed.
The system of drains and levees by which commissioners

had protected the lands of their district might be impaired or destroyed by the action of commissioners of an adjoining district and the works of the latter might be in turn rendered useless by the subsequent proceedings of the first set of commissioners. The Drainage law provides for the organization of districts. Adjoining districts may be seriously affected by each other's work. The statute authorizes any drainage district organized under any law of this State to connect its levees, ditches or drains with the levees, ditches or drains of any adjoining district and for the assessment of benefits on adjoining districts for any work which any district may do by which an adjoining district is benefited, and authorizes commissioners of adjoining districts to adjust the benefits between them by contract, which must be approved by the court, and if the commissioners fail to agree, a proceeding is provided by which the judgment of the court may be obtained determining the amount which shall be paid by the one district to the other. (Laws of 1913, p. 271.) Adjoining drainage districts may also construct joint pumping stations, ditches, levees or other works and maintain and operate them by contract entered into by their commissioners and approved by the county court. (Laws of 1913, p. 276.) When any stream or water-course in this State constitutes the common outlet for two or more drainage districts the statute provides a method for organizing an outlet drainage district, to be paid for by special assessment on the lands benefited. (Laws of 1917, p. 365, adding section 65a to the Levee act.) In no case, however, are the commissioners authorized to enter into a contract fixing a liability on their district without the approval of the court. The commissioners have no power to impose any liability on the district except upon a hearing in court, at which every land owner shall have the opportunity to appear and be heard. The only method by which any liability against the district can be discharged is by an assessment against the land of each land owner who

is benefited by the proposed work for which the liability is incurred, and since each land owner may be called upon to pay his proportion, but in no event more than the amount of the benefit to his land, he has a right to be heard at every stage of the proceedings to fix his liability. *Badger* v. *Inlet Drainage District,* 141 Ill. 540.

It is true, Indian Creek Drainage District No. 2 was not in court objecting to the approval of the work proposed to be done by the Lower Indian Creek District, but since the object of the petition was to authorize work to be done, the payment of which would require an assessment on the lands of the district, every land owner in the district was a person interested who was entitled to notice and had a right to a hearing on the question of the power of the court to authorize the work, as well as the question of the feasibility of the plan and other questions proper to be considered on the question of its approval. (*Badger* v. *Inlet Drainage District, supra.*) In the two statutes cited authorizing a drainage district to connect its levees, ditches or drains with those of an adjoining district and the assessment of benefits on adjoining districts for any work which any district may do by which an adjoining district is benefited, notice of the petition for the approval of the contract of the commissioners was required to all persons interested and provided that on the hearing all persons interested should have a right to be heard, and the general policy of the Drainage law gives a right to a hearing on all questions which may result in an assessment of the land in the district to every land owner whose property may be liable to assessment. Land owners of the district did appear, objections were heard and overruled, and on this appeal they have a right to have the judgment of the court on the questions presented by their objections reviewed. Mud Creek Drainage District filed objections, and so did certain owners of land in that district which might be liable to assessment. All of these objectors appealed, and the

record presents the question of the correctness of the order approving the plan of the Lower Indian Creek District to obstruct and destroy the outlet of Indian Creek District No. 2, and to go into the territory of Indian Creek District No. 2 and Mud Creek District,—districts to which it is servient,—to condemn land for the construction of ditches in these upper districts and to construct ditches in those districts.

The record shows that on August 13, 1928, the commissioners of Indian Creek Drainage District No. 2 held a meeting and adopted a resolution requesting the commissioners of Lower Indian Creek Drainage District to file a petition for the construction of the work proposed in the petition in this case and proceed with its construction on the basis that lands of Indian Creek Drainage District No. 2, of Clear Creek Drainage District and of Mud Creek Drainage District would be benefited by the work to the extent of thirty-five per cent of its cost; that if the work is constructed and any portion of the cost is paid by the State of Illinois· all of the portion paid by the State shall go to the Lower Indian Creek District, and whatever amount is collected by the Lower Indian Creek District from Mud Creek District and Clear Creek District shall go in reduction of the percentage of benefits which it is estimated that Indian Creek District No. 2 will receive, and Lower Indian Creek District shall proceed to collect from Mud Creek District and Clear Creek District their full proportionate share of the cost of the work in accordance with law, all expenses of such proceedings, however, to be borne by Indian Creek District No. 2. This resolution had no effect on the rights of the land owners in Indian Creek District No. 2 on the hearing of the petition and their objections, and gave the commissioners of Lower Indian Creek District no authority which they did not have by law to enter upon the territory of Indian Creek District No. 2 and

upon its works, to destroy its outlet or to change its ditches within its own territory. The commissioners of Indian Creek District No. 2 had no right to abdicate their power and transfer their trust and duty to other persons. They could make no contract by which any of the works of the district would be abandoned or changed or any liability of the district incurred except in the manner provided by law, with the approval of the county court, and the law contains no authority by which the commissioners of a dominant district or water-course can give authority to the commissioners of a servient district to enter into the territory of a dominant district, condemn land for the purpose of a drain in the dominant district and construct a drain on the land so condemned. The relations between adjoining drainage districts can be adjusted only in the manner provided by the statutes. If those statutes are insufficient, the remedy for the insufficiency is by an appeal to the legislature.

The trial court erred in granting the prayer of the petition. The order is reversed and the cause is remanded.

*Reversed and remanded.*